## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VERONICA S. LATOURETTE,⠀⠀⠀⠀: Civil No. 1:24-CV-516
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀: (Chief Magistrate Judge Bloom)
MICHELLE KING, Acting⠀⠀⠀⠀:
Commissioner of Social Security,[1]⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀:

## MEMORANDUM OPINION

## I.⠀⠀Introduction

On March 17, 2021, Veronica Latourette filed an application for disability and disability insurance benefits under Title II of the Social Security Act. A hearing was held before an Administrative Law Judge ("ALJ"), who found that Latourette was not disabled from her alleged onset date, December 17, 2019, to June 1, 2023, the date the ALJ issued his decision.

---

[1] Michelle King became the acting Commissioner of Social Security on January 20, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Michelle King is substituted as the defendant in this suit.

Latourette now appeals this decision, arguing that the decision is not supported by substantial evidence. After a review of the record, we agree and conclude that the ALJ's decision is not supported by substantial evidence. Therefore, we will remand this matter for further consideration by the Commissioner.

## II.    Statement of Facts and of the Case

On March 17, 2021, Latourette applied for disability and disability insurance benefits, alleging disability due to high cholesterol, hypothyroidism, depression, anxiety, bipolar disorder, arthritis, knee and hip pain, and tinnitus in her left ear.  (Tr. 129). Latourette was 49 years old on her alleged onset date of disability, had at least a high school education, and had past work as a teacher's aide. (Tr. 30, 129).

The medical records[2] underlying Latourette's appeal revealed that prior to her alleged onset of disability, Latourette was admitted for inpatient psychiatric hospitalization in New York in 2018 after an

---

[2] We limit our discussion of the medical records to records involving Latourette's mental health impairments because, as we will discuss, we are remanding this matter due to the ALJ's failure to adequately explain the omission of certain mental limitations in the RFC determination.

incident occurred at her work. (Tr. 309-439). It was noted that Latourette was referred by her outpatient psychiatrist after exhibiting increasingly aggressive behavior with suicidal and homicidal ideation. (Tr. 319). Upon her discharge, treatment notes indicate that Latourette planned on retiring from her job because it was a major stressor for her. (Tr. 320). It was recommended that Latourette follow up with outpatient psychotherapy. (*Id.*).

In May and June of 2019, Latourette reported to the emergency department at Geisinger Community Medical Center ("CMC") in Scranton, Pennsylvania. (Tr. 499, 503). In May, she reported that she was new to the area and had not yet established care but was worried about running out of her medications. (Tr. 503). She further reported increased stress and anxiety. (*Id.*). A psychiatric examination was unremarkable, and her medications were refilled. (Tr. 505-06). In June, Latourette again reported she was running out of her medications and expressed a desire to start treatment with Scranton Counseling Center ("SCC"). (Tr. 499). She was advised to go to SCC as a walk-in. (Tr. 502). The medical records contain treatment notes from SCC in July,

September, and October, for walk-in appointments. (Tr. 1009-21). At these appointments, Latourette reported feeling anxious, and her medications were adjusted. (*Id.*). Her mental status examinations at these visits were generally unremarkable. (Tr. 1010, 1014, 1019). Also in July, Latourette established care with a primary care provider, at which time it was noted that she established care with SCC, was back on her medications, and was doing well. (Tr. 607).

Latourette presented to the emergency room in September of 2019 complaining of medication side effects, including a migraine and slurred speech. (Tr. 488). A mental status evaluation revealed an anxious mood, normal speech, euthymic affect, intact attention and concentration, and fair insight and judgment. (Tr. 489-90). Her medications were filled, and she was advised to make an appointment with SCC. (Tr. 490). At an evaluation at SCC with Tiffany Hughes-Eagen, M.D., in November of 2019, she reported ongoing anxiety and sleep problems. (Tr. 1005). Other than an anxious and depressed mood, her mental status examination was generally unremarkable. (Tr. 1006). She reported that

4

her medications were helpful, but Dr. Hughes-Eagen switched her medications due to side effects including migraines. (Tr. 1007).

Latourette continued treating at SCC in January of 2020. (Tr. 1000). She reported decreased motivation, and the need for her daughter's help at home. (*Id.*). She also reported ongoing irritability. (*Id.*). Her mental status examination revealed a depressed mood, normal speech, coherent thought processes, intact memory and concentration, and fair insight and judgment. (Tr. 1001). In May, Latourette complained of increased anxiety and panic attacks. (Tr. 995). Treatment notes from a telehealth visit with Geisinger in August of 2020 indicated Latourette was "having difficulty mentally lately" and that her "Bipolar and other psych issues are not well controlled." (Tr. 473, 477). Around this time, an updated psychiatric evaluation at SCC noted an anxious mood on examination but otherwise unremarkable mental status findings. (Tr. 448-49). In November, treatment notes from SCC noted that Latourette's food stamps had been cut off and she was appealing her disability case. (Tr. 457). However, Latourette reported she had been stable on her medications despite her recent stressors and denied

medication side effects. (*Id.*). A mental status examination at this time revealed a euthymic mood, normal speech, and coherent thought processes. (Tr. 458-59).

In June of 2021, Latourette underwent a mental status evaluation with Dr. John Miller, Ph.D. (Tr. 727-34). Dr. Miller noted Latourette's history of bipolar disorder and her 2018 psychiatric hospitalization. (Tr. 737). Latourette reported sleep difficulties, loss of appetite, excessive worry, panic attacks, and recurring manic episodes. (Tr. 728). On examination, Latourette had an anxious mood, agitated affect, fluent and clear speech, coherent thought processes, intact attention and concentration, impaired memory, and good insight. (Tr. 729-30). Dr. Miller opined that Latourette had mild limitations with simple instructions and moderate limitations in understanding, remembering, and carrying out complex instructions. (Tr. 732). He further opined that Latourette had moderate limitations in her ability to interact with others. (Tr. 733).

Latourette continued to treat at SCC in February of 2021. (Tr. 452). A progress note from this visit indicates that Latourette reported

hallucinations and difficulty sleeping but that her mood was stable. (Tr. 452). Other than an anxious mood, her mental status examination was generally unremarkable. (Tr. 453-54). In July of 2021, she reported a depressed mood and difficulty with self-care. (Tr. 841). In September, she reported experiencing irritability and a panic attack while shopping. (Tr. 847). On examination, Latourette exhibited an irritable and depressed mood, normal speech, intact memory, adequate concentration, and fair insight and judgment. (Tr. 848-49). Throughout this time, Latourette's symptoms were managed with medication. (*Id.*).

In November of 2021, Latourette reported increased stress because she had to move out of her apartment. (Tr. 945). It was noted that she appeared to have delayed speech and memory problems. (*Id.*). She required a refill of her medications but reported no issues or side effects from her medications. (*Id.*). On examination, Latourette had an anxious and irritable mood, normal and spontaneous speech, intact memory, adequate concentration, and good insight and judgment. (Tr. 946-47). In January of 2022, Latourette was upset and tearful and reported stressors of managing finances and her inability to work due to her anxiety and

depression. (Tr. 914). Similarly, in May, Latourette reported difficulties with sleep and self-care, as well as needing help from her daughter and ex-husband. (Tr. 908).

At a visit to SCC in July of 2022, Latourette reported an ongoing struggle with her depression. (Tr. 980). On examination, she exhibited a depressed and anxious mood, a constricted affect, normal speech, coherent thought processes, intact memory, and adequate concentration. (Tr. 981-82). Treatment notes from September indicate that Latourette reported a stable mood and that she was managing her anxiety and depression. (Tr. 975). She further indicated that she would like to continue her medication regimen, and denied hallucinations, suicidal ideations, and paranoia. (*Id.*). Her mental status findings were unremarkable. (Tr. 975-76). Similarly, in November of 2022 and January and February of 2023, Latourette reported that her anxiety was manageable, and that while she had residual symptoms, she was doing "ok." (Tr. 956-60, 962-66, 986-73).

It was against the backdrop of this evidence that the ALJ conducted a hearing on April 3, 2023, during which Latourette and a vocational

expert testified. (Tr. 37-66). Following the hearing, on June 1, 2023, the ALJ issued a decision denying Latourette's application for benefits. (Tr. 14-32). At Step 1 of the of the sequential analysis that governs Social Security cases, the ALJ concluded that Latourette did not engage in substantial gainful activity since her alleged onset of disability, December 17, 2019. (Tr. 20). At Step 2, the ALJ found that Latourette suffered from the following severe impairments: polyarthritis; bicipital tendonitis of the left shoulder; tinnitus; bilateral sensorineural hearing loss; decreased hearing of the left ear; major depressive disorder with psychotic features; bipolar I disorder; anxiety; attention deficit hyperactivity disorder ("ADHD"); and panic disorder. (*Id.*). At Step 3, the ALJ concluded that none of Latourette's severe impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 21-25). The ALJ found that Latourette had moderate limitations in three of the four broad areas of mental functioning. (*Id.*).

Between Steps 3 and 4, the ALJ concluded that Latourette:

[H]a[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, but no climbing of ladders, ropes, or

scaffolds. The claimant must avoid concentrated exposure to extreme cold, wetness, vibration, and hazards. She is limited to work involving only simple, routine, repetitive tasks, with no fast-paced production requirements. She is limited to no more than simple work-related decisions. She can tolerate no more than occasional changes in the work setting. She is limited to occasional interaction with supervisors, co-workers, and the public.

(Tr. 25).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Latourette's reported symptoms. (Tr. 25-30). With respect to the medical opinion evidence regarding Latourette's mental impairments, the ALJ considered Dr. Miller's June 2021 opinion, as well as the July and November 2021 opinions of the state agency consultants, Dr. Taren and Dr. Cannon, and found these opinions persuasive. (Tr. 28). Each of these opinions contained a variation of a similar limitation—Dr. Miller opined that Latourette had moderate limitations in understanding and carrying out complex instructions; Dr. Taren opined that Latourette was limited to simple instructions; and Dr. Cannon opined that Latourette was limited to short simple instructions (i.e. perform/follow one and two step tasks/instructions) and had a moderate limitation in her ability to

carry out detailed instructions.  (Tr. 124, 136, 732).  The ALJ did not discuss these limitations separately but instead discussed the opinions as a group, finding them persuasive, reasoning that they were consistent with the medical records, with the opinions of the other providers, and with Latourette's activities of daily living.  (Tr. 28).

The ALJ also considered Latourette's symptoms, but ultimately found that the statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence. (Tr. 26-28).  Latourette testified that she stopped working due to her bipolar disorder and panic attacks, which caused her to become irritated with others.  (Tr. 47-48, 51).  She recounted the incident that occurred at her work in 2018 which resulted in a psychiatric hospitalization.  (Tr. 48-49).  Latourette stated that she had difficulties with her memory, and that her daughter helped her with things around the house and reminded her to take her medications.  (Tr. 55, 57).  She reported that her mental health impairments affected her memory, concentration and sleep.  (Tr. 58).

The ALJ found Latourette's statements were not entirely consistent with the medical records. (Tr. 26). The ALJ recounted the medical records, which included both unremarkable and abnormal examination findings during the relevant period. (Tr. 27-28). Ultimately, the ALJ concluded that the medical records, as well as the medical opinion evidence, did not fully support Latourette's allegations of disabling impairments. (*Id.*).

Having made these findings, at Step 4 the ALJ found that Latourette could not perform her past work but found at Step 5 that Latourette could perform jobs in the national economy, such as a collator operator, marker, and a router. (Tr. 31). Accordingly, the ALJ found that Latourette had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 31-32).

This appeal followed. On appeal, Latourette argues that the ALJ erred in his consideration of the opinion evidence and failed to include adequate mental limitations in the RFC—specifically, a limitation to one to two step tasks. After consideration, we conclude that the ALJ's opinion

is not supported by substantial evidence. Accordingly, we will remand this matter to the Commissioner for further consideration.

## III.  Discussion

### A. Substantial Evidence Review – the Role of This Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v.*

13

*Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether Latourette is disabled, but rather whether the Commissioner's finding that he or she is not disabled

14

is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot reweigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v.*

*Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

## B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which

16

exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether Latourette: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine Latourette' residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20

C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all Latourette' medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of the analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

Latourette bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that Latourette can perform consistent with Latourette' RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting*

18

*Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion

supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15. Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

## C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in March of 2021 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion

21

without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

## D. The ALJ's Decision is Not Supported by Substantial Evidence.

As we have noted, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests," *Cotter*, 642 F.2d at 704, and the ALJ must "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). After consideration, we conclude that the ALJ's RFC determination is not supported by an adequate explanation.

Here, Latourette contends that the ALJ erred in failing to include a limitation in the RFC to "one to two step tasks" despite finding the

22

opinions of the mental health examiner and state agency consultants persuasive. Instead, the RFC limited Latourette to "work involving only simple, routine, repetitive tasks, with no fast-paced production requirements[,]" and involving only "simple work-related decisions." (Tr. 25). While we believe this to be a close case, we conclude that the ALJ's failure to explain the omission of such a limitation from the RFC determination warrants a remand.

While an ALJ is not required to accept every limitation set forth in an opinion that is found to be persuasive, the decision must adequately explain the rationale behind the RFC determination. *Durden*, 191 F. Supp. 3d at 455. Here, the ALJ found the mental health providers' opinions persuasive. In doing so, the ALJ considered the opinions together, noting that they found Latourette capable of understanding, recalling, and carrying out short, simple instructions. (Tr. 28). However, the ALJ failed to include a limitation to either short, simple instructions or one-to-two-step tasks in the RFC, instead limiting Latourette to simple, routine tasks and simple work-related decisions.

23

In our view, the ALJ's decision is not supported by substantial evidence. In making this finding, we are persuaded by at least one case in this circuit that considered this same issue. In *Cowher v. O'Malley*, 2024 WL 3161865 (W.D. Pa. June 24, 2024), the court considered a similar argument by the plaintiff. In that case, the ALJ found persuasive two opinions that limited the plaintiff to "very short and simple instructions," but failed to include such a limitation in the RFC, instead limiting the plaintiff only to "simple instructions." *Id.* at *7. The court first noted that "a difference exists between an individual capable of following 'simple instructions,' and an individual only capable of following 'very short and simple instructions (i.e., perform one and two step tasks)[.]'" *Id.* (citations to the record omitted). The court then considered how the Dictionary of Occupation Titles ("DOT") defines the different "reasoning development" levels associated with certain occupations: "Jobs at Reasoning Development Level 1 ('R1') require an employee to '[a]pply commonsense understanding to carry out *simple one- or two-step instructions*[,]' while Jobs at Reasoning Development Level 2 ('R2') require the ability to '[a]pply commonsense understanding

to carry out *detailed but uninvolved written or oral instructions*[.]'" *Id.* (citing Appendix C – Components of the Definition Trailer, 1991 WL 688702 (emphasis in original)).

The *Cowher* court went on to conclude that a limitation to "very short and simple instructions" was likely inconsistent with reasoning level 2 occupations. *Cowher*, 2024 WL 3161865 at* 7. The court further concluded that the ALJ failed to adequately explain the omission of such a limitation despite finding the opinions setting forth such a limitation persuasive, finding that the ALJ never addressed his decision to limit the plaintiff to only "simple" instructions, nor explained his rejection of the more restrictive limitation to "very short and simple instructions." *Id.* at *8. However, in that case, the court ultimately found that this error was harmless, as the ALJ identified at least one occupation at Step 5 with a reasoning level 1 that the plaintiff could perform. *Id.* at *9-10.

Here, we similarly find that the ALJ's omission of a one-to-two-step tasks or simple instructions limitation was not adequately explained in the decision. Despite finding the opinions of the mental health providers persuasive, the ALJ failed to adequately explain how his RFC limiting

Latourette to "simple, routine, repetitive tasks" accounted for the limitations to simple instructions that the ALJ found persuasive.  As we have noted, while the ALJ is not required to accept every limitation set forth in an opinion he finds persuasive, he must at a minimum explain the rationale behind the RFC determination. *Durden*, 191 F. Supp. 3d at 455.  Further, the ALJ may not "reject evidence for no reason or the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).  Here, the ALJ discussed the mental health opinion evidence together.  In doing so, the ALJ failed to provide an adequate explanation for discounting Dr. Cannon's limitation to one-to-two-step tasks.  While the ALJ may have relied on other evidence in the record to conclude that this limitation was not credibly established, there is nothing in the decision to indicate which evidence he relied on or why he rejected this limitation set forth by Dr. Cannon's opinion, which he found persuasive. Accordingly, we conclude that the ALJ's omission of the "one-to-two-step tasks" or "simple instructions" limitation was not adequately explained in the decision, and therefore, is not supported by substantial evidence.

We further conclude that this error is not harmless. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014). In this case, the ALJ's decision at Step 5 identified three jobs that Latourette could perform—collator operator (DOT 208.685-010, 1991 WL 671753); marker (DOT 209.587-034, 1991 WL 671802); and router (DOT 222.587-038, 1991 WL 672123), all of which require reasoning level 2. As discussed in *Cowher*, as well as in several other cases we find persuasive, a limitation to one-to-two-step tasks can (but does not always) preclude jobs requiring reasoning level 2, as such jobs require that an individual be able to carry out "detailed but uninvolved written or oral instructions." *See Cowher*, 2024 WL 3161865, at *9-10; *see also Leach v. Kijakazi*, 70 F.4th 1251, 1257 (9th Cir. 2023) ("A level-two job with 'detailed but uninvolved ... instructions' could require an employee to follow lengthy simple instructions. On the present record, then, we cannot determine

whether the level-two jobs identified by the vocational expert require only short, simple instructions."); *Thomas v. Berryhill*, 916 F.3d 307, 314 (4th Cir. 2019) ("We believe that Thomas, being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions.").

Here, the jobs identified by the ALJ at Step 5 require a reasoning level 2, which could be inconsistent with a limitation to one-to-two-step tasks. Further, we have concluded that the ALJ did not adequately explain the omission of such a limitation. Accordingly, given that such a limitation could preclude the jobs identified by the ALJ at Step 5, we find that the failure to explain this omission is not harmless and requires a remand.

Accordingly, a remand is required for further consideration of these issues. While we reach this conclusion, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on the ultimate outcome of this matter. Rather, that task is left to the ALJ on remand.

## IV.  Conclusion

For the foregoing reasons, the decision of the Commissioner will be

REMANDED for further consideration.

An appropriate order follows.


*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge


Date: February 21, 2025